UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| COSTCO WHOLESALE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ARROWOOD INDEMNITY COMPANY,<br><br>Defendant. | NO. C17-1212RSL<br><br>ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the parties' cross-motions for summary judgment.
Dkt. # 53 and # 65 (redacted versions of the motions are publicly available at Dkt. # 57 and
# 62). Plaintiff alleges that defendant, the third layer excess insurer in an employment practices
liability insurance tower, is obligated to pay losses plaintiff incurred in settling an employment
discrimination class action and distributing the settlement funds. Plaintiff seeks a declaration that
it is entitled to coverage and has asserted claims of breach of contract, bad faith, violations of the
Washington Consumer Protection Act ("CPA"), and violations of the Insurance Fair Conduct
Act ("IFCA"). Both parties request that judgment be entered in their favor.

Summary judgment is appropriate when, viewing the facts in the light most favorable to
the nonmoving party, there is no genuine issue of material fact that would preclude the entry of
judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial

responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

### BACKGROUND

In August 2004, a class action lawsuit was filed against Costco alleging gender discrimination in its promotion decisions. Costco had notified Arrowood's predecessor of a

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 2

potential claim and promptly provided notice of the lawsuit when it was filed. In 2013, Costco notified Arrowood (and all of the other insurers in the insurance tower) that the parties were going to mediate the dispute and inquired if they planned to attend. Arrowood did not respond. All other insurers in the employment practices liability tower participated in the first round of mediation, including the insurer above Arrowood. As mediation progressed, Arrowood became aware that Costco had rejected an offer to settle the litigation in exchange for a lump-sum payment, instead preferring a process where each class member would prove her right to relief and her damages through individual litigation or arbitration. Arrowood offered no comments and asked no questions. Despite having made no independent effort to quantify or calculate Costco's overall exposure, Arrowood apparently assumed that Costco's total expenditures related to the lawsuit would be around $20 million based on the insured's July 26, 2013, estimate of its "Phase II" financial exposure. Dkt. # 54-4 at 2-4.[1] The estimated exposure was expressly limited in time and scope, however, and did not reflect known expenses such as Costco's and plaintiffs' costs and attorney's fees up to the time of settlement, the non-reversionary settlement amount, or the judgment and attorney's fees associated with the Sasaki trial.[2] By August 2013, Arrowood had (or would have had if it had made an effort to investigate Costco's claim) information showing that Costco's potential exposure exceeded the $35 million level at which Arrowood's excess policy would be triggered.

---

[1] As the third layer excess insurer, Arrowood would not be on the risk unless and until Costco's losses exceeded $35 million.

[2] One of the named plaintiffs in the underlying action opted to go to trial in federal court on her claims against Costco rather than participate in the class settlement.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 3

In October 2013, Costco agreed to settle the class action by making a non-reversionary payment of $8 million. Each class member would have the opportunity to challenge up to three promotion decisions in individual arbitration proceedings. Only economic damages and attorney's fees would be awarded to successful claimants in the arbitral proceedings, and the outcomes would be confidential. Costco would make an initial payment to cover anticipated administrative costs, but the remainder of the settlement fund would be paid out when the final arbitration award was entered. Costco's liability to the class was fixed at $8 million regardless of how much the class members were awarded through arbitration. Costco neither sought nor obtained Arrowood's consent before entering into the settlement agreement.

The district court granted preliminary approval of the settlement on February 12, 2014. Approximately six weeks later, Arrowood closed its claim file with the following notation:

> APPEARS CLAIM HAS SETTLED. It appears that the CLASS action has settled although the court approval has not been completely finalized. The exact amount of the settlement is unknown; however, we were never requested to attend a mediation or contribute to a settlement pool. The court order grant [sic] preliminary approval indicates that the named plaintiffs may bring an action in their own name outside of the class if they so choose.
>
> As the expose [sic] of this claim appears to be contained within the underlying layers of coverage, I am closing this file. Linda Murray.

Dkt. # 58-20 at 2. At her deposition, Ms. Murray acknowledged that Costco had extended an open invitation to all of the insurers in the employment practices liability tower to attend the mediation. Dkt. # 63-1 at 304-05. Despite recognizing that the amount of the settlement was unknown, there is no indication that Ms. Murray attempted to calculate Costco's past and

potential outlays before closing the claim file.

Final approval of the settlement agreement occurred in May 2014. Between July 2014 and July 2015, Costco sent Arrowood (and the other insurers) at least eleven communications mostly regarding the status of the <u>Sasaki</u> proceedings, but also notifying Arrowood of the number of claims to be arbitrated, progress in effectuating programmatic relief, and the resolution of an outstanding issue regarding the scope of the class. There is no indication that Costco provided Arrowood with any invoices or updated estimates regarding the cost of the arbitral proceedings as they progressed. Costco neither sought nor obtained Arrowood's consent before incurring post-settlement fees and costs. Arrowood did not respond to the communications from Costco.

In March 2017, Costco notified Arrowood that the underlying layers of coverage would soon be exhausted. By that time, Costco had incurred almost $32 million in fees and costs since the underlying lawsuit was filed (Dkt. # 56-2 at 26) and had completed approximately 60% of the post-settlement arbitrations. Arrowood issued revised coverage letters pointing out that Costco had not obtained Arrowood's consent to the claims-arbitration process, stating that the expenses related to the on-going arbitrations were unreasonable and did not constitute "Loss" under the policy, indicating that it was proceeding under a full reservation of its rights, and requesting additional information. This coverage suit was filed on July 25, 2017.

The underlying policy limits were exhausted in April 2018, and Arrowood began reimbursing Costco for its arbitration-related expenses, totaling $565,898.54.[3] When the final

---

[3] This number is taken from Arrowood's motion for summary judgment. Dkt. # 53 at 12. Defendant's expert, Michael Diliberto III, has calculated Arrowood's arbitration-related payments as $623,303.10 (Arrowood's payments less the DCI Consulting invoice amount). Dkt. # 56-2 at 27.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 5

arbitration award was entered, Costco requested and Arrowood paid the $7,945,000 balance of the settlement amount. Arrowood made all payments while reserving its right to recover the amounts paid if it prevails in this litigation.

DISCUSSION

**A. Prior Consent**

The Arrowood policy generally follows the form of the primary policy issued by AIG. The AIG policy provides that the insurers will pay "the Loss of" the insured, a term that is defined to include "Defense Costs." Dkt. # 58-2 at 4 and 6. "Defense Costs" mean the "reasonable and necessary fees, costs and expenses *consented to by the Insurer* . . . resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds . . . ." Dkt. # 58-2 at 5 (emphasis added). The policy further provides:

> The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs *without the prior written consent of the Insurer*. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy.

Dkt. # 58-2 at 12 (emphasis added). Arrowood argues that because Costco did not get prior written consent to the settlement or to the costs and expenses incurred in post-settlement arbitration, they are not "Loss" recoverable under the policy.

The Washington Supreme Court dealt with a similar argument in Pub. Util. Distr. No. 1 of Klickitat Cty. v Int'l Ins. Co., 124 Wn.2d 789 (1994). The policy forbade the insured from settling a claim without the agreement of the insurer. The court found that consent clauses are like cooperation and notice clauses in that they are

condition[s] the insured must fulfill to create the insurer's obligation to pay under the policy. Such conditions designate the manner in which claims covered by the policy are to be handled once a claim has been made or events giving rise to a claim have occurred. They are clearly placed in policies to prevent the insurer from being prejudiced by the insured's actions. To release an insurer from its obligations without a showing of actual prejudice would be to authorize a possible windfall for the insurers. . . . Thus, we find an insurer cannot deprive an insured of the benefit of purchased coverage absent a showing that the insurer was actually prejudiced by the insured's noncompliance with conditions precedent such as those at issue in this case.

Id. at 803-04. See also Mut. of Enumclaw Ins. Co. v. T&G Constr., Inc., 165 Wn.2d 255, 268-69 (2008). Arrowood's attempts to distinguish Klickitat and T&G Construction are not well-taken. The cases reflect a policy judgment regarding the circumstances in which an insurer will be excused from having to cover a loss once a claim has been made (if the policy is triggered by the making of a claim within the policy period) or once the events giving rise to a claim have occurred (if the policy is triggered by an occurrence). The AIG policy is a claims-made policy: AIG will pay losses arising from a claim first made against the insured during the policy period and reported to the insurer pursuant to the policy. Under Klickitat and T&G Construction, once notice of a claim is provided and coverage has been triggered, the insurer will be relieved of its obligations under the policy only if it shows that it was prejudiced by the insured's failure to comply with a consent, cooperation, or notice provision.[4] The fact that AIG's policy incorporates

[4] Arrowood's reliance on Quellos Group LLC v. Fed. Ins. Co., 177 Wn. App. 620 (2013), is misplaced. The policy in Quellos was an excess policy, and liability did not attach until the underlying insurers paid the full limits of their policies. Pursuant to the terms of the settlement in that case, the insured made direct payments in place of the insurers: the underlying policies were therefore not exhausted. Because the excess policy was not triggered in the first instance, the insurer was not attempting to avoid its coverage obligations and was therefore not required to show prejudice. Here, a

the consent requirement into the insuring provision through a series of interlocking definitions does not alter the analysis. The consent condition comes into play only after the policy has been triggered. It is therefore one "the insured must fulfill to create the insurer's obligation to pay under the policy." Klickitat, 124 Wn.2d at 803. In these circumstances, Washington imposes upon the insurer the obligation of showing actual prejudice before recovery under the policy will be limited or lost.

Arrowood argues that Costco's failure to request or obtain its consent before spending $15 million in fees and costs[5] to distribute the settlement fund caused prejudice. Arrowood maintains that Costco "grossly mismanaged the post-settlement process" and that, had Costco sought Arrowood's consent to the arbitration expenditures as they were being incurred, Arrowood would have challenged the reasonableness of the "extraordinary post-settlement expenditure" and worked "with Costco to control its costs to align with its exposure." Dkt. # 82 at 7; Dkt. # 106 at 5-6.[6]

---

claim was first made against Costco during the policy period and reported to Arrowood pursuant to the terms of the policy. Once the underlying policy limits were exhausted, coverage attached. To the extent Arrowood seeks to avoid payment of some or all of the claim because the insured did not comply with a condition of payment, it must show prejudice under Washington law.

[5] Costco disagrees with the way Arrowood uses the $15 million figure, pointing out that the total includes not only attorney's fees related to arbitration, but also the defense and settlement costs associated with the Sasaki trial and costs charged by the arbitrator and experts. Unless the Court is simply stating Arrowood's argument, the Court uses the $15 million figure to represent post-settlement expenditures in general.

[6] Arrowood does not argue that it was prejudiced by the fact that Costco failed to obtain consent before agreeing (a) to pay $8 million to settle the gender discrimination claims or (b) to distribute the funds through individual arbitrations. Dkt. # 106 at 5; Dkt. # 82 at 7. An insurer may not unreasonably withhold consent to a settlement or expenditure, and both the settlement amount and the distribution method were approved by the District Court of the Northern District of California. While the district

"[I]n order to show prejudice, the insurer must prove that an insured's breach of a notice provision had an identifiable and material detrimental effect on its ability to defend its interests. This rule will manifest itself differently depending on the kind of prejudice an insurer claims." Mut. of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wn.2d 411, 430 (2008). In this case, Arrowood argues that it was prejudiced by the loss of the opportunity to control the costs Costco was incurring in arbitration prior to March 2017, when it received notice that post-settlement expenses were mounting and its policy would likely be triggered. Arrowood was not, however, asked to pay any of the pre-March 2017 expenditures. The first and second layer excess insurers, AIG and Zurich, paid all costs associated with the post-settlement process until March 2018. Dkt. # 56-2 at 27. By that time, Arrowood had over a year to "help" Costco control its expenditures or, if those efforts proved unsuccessful, it could refuse payment of objectionable invoices once its policy was triggered. Instead, Arrowood paid the invoices just as AIG and Zurich had, but with a reservation of the right to challenge the reasonableness of the expenditures in this litigation.

Arrowood is essentially arguing that its policy should never have been triggered because the underlying insurers should have refused to pay some or all of the invoices submitted to them, and that if its consent had been sought, it could have kept payments below its $35 million level. Arrowood may not, however, second-guess the coverage determinations of the underlying insurers, and it had no contractual right to interfere in their adjustment processes. While

_____

court's reasonableness determination would not be binding on non-party Arrowood (see Rees v. Viking Ins. Co., 77 Wn. App. 716, 719 (1995)), Arrowood has apparently conceded that the settlement and settlement process were, at least in theory, reasonable.

Arrowood is not bound by AIG or Zurich's interpretation or application of the policy when making its own coverage decisions (see Shy v. Ins. Co. of the State of Pa., 528 Fed. Appx. 752, 754 (9th Cir. 2013)), the weight of authority holds that an excess insurer may not challenge the underlying insurers' payment decisions in order to argue that their policy limits were not (or should not have been) exhausted. See, e.g., Edward E. Gillen Co. v. Ins. Co. of the State of Pa., C10-564, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) (the excess insurer "is free . . . to contest coverage under its own policy. But an excess liability insurer cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance."); ARM Props. Mgmt. Group v. RSUI Indem. Co., A-07-CA-718-SS, 2008 WL 5973220, at *5-7 (W.D. Tex. Aug. 25, 2008) (rejecting excess insurer's argument that the underlying policy limits had not been exhausted because the underlying insurers had made payments outside the scope of the coverage, had failed to take advantage of exceptions to coverage, or had otherwise overpaid); Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403, 416-17 (R.I. 2001) (affirming trial court decision finding that, "absent fraud between the insured and the primary carrier, 'the insured does not carry the burden of proving the soundness of the primary carrier's decision to pay . . . [I]t is for the excess carrier to seek redress from the underlying carrier should the excess carrier believe that the underlying carrier has exposed it to liability or caused it harm by mishandling the claim in some respect."). See also Allan D. Windt, Insurance Claims and Disputes, § 6:45A (6th ed. 2018) ("In short, at least absent fraud/bad faith, an excess insurer is bound by the fact that the primary insurer has paid, and cannot contest (a) that such payment reduces the primary insurer's applicable aggregate, or (b) that the excess insurer must provide policy benefits when the aggregate in any relevant

primary policy has been exhausted.").

Despite this authority, Arrowood argues that its policy language requires the insured to show that the underlying insurers correctly adjusted the claim and paid only those invoices that actually fell within the scope of coverage. Arrowood's policy attaches when "the insurers of the Underlying Policies shall have paid in legal currency the full amount of the Underlying Limit[s] . . . and the Insured[] shall have paid the uninsured retention." Dkt. # 58-1 at 3 (Section II.A.). Arrowood does not dispute that AIG and Zurich paid their underlying limits and that Costco paid its retained amount. Rather, Arrowood relies on a subsequent policy provision, Section II.C., which states in relevant part, "In the event and only in the event of the reduction or exhaustion of the Underlying Limit by reasons of the insurers of the Underlying Policies paying in legal currency Loss, this policy shall: (i) in the event of reduction, pay excess of the reduced Underlying Limit, and (ii) in the event of exhaustion, continue in force as primary insurance. . . ." Dkt. # 58-1 at 3. There are unpublished decisions from Minnesota interpreting this language and holding that, in pursing a claim of coverage against an excess insurer, it is not sufficient for an insured to simply show:

> that the underlying insurers made payments in the amount of the underlying liability limits; it is also necessary for [the insured] to show that the payments that were made fit within the policy definition of "Loss" . . . . [If the underlying insurers] made payments that did not fit within the policy definition of "Loss," [the insured] cannot rely on those payments to establish that the underlying policies have been exhausted.

Royal Indem. Co. v. C.H. Robinson Worldwide, Inc., No. A08-0996, 2009 WL 2149637, at *2 (Minn. App. July 21, 2009). See also H.B. Fuller Co., v. U.S. Fire Ins. Co., C09-2827JRT/JJG,

2012 WL 12894484, at *8 (D. Minn. Mar. 2, 2012).

Under Washington law, courts "interpret insurance policies as a matter of law." Kitsap Cty. v. Allstate Ins. Co., 136 Wn.2d 567, 575 (1998).

> Insurance policies are contracts, and courts seek to determine the contracting parties' intent by resorting to a fair, reasonable, and sensible construction of the contract's language, as the average insurance purchaser would understand it.
>
> In general, we will enforce an insurance contract as written if the contract is clear and unambiguous. If a policy leaves a term undefined, we give the term its plain, ordinary, and popular meaning; we may use a standard English dictionary definition as an aid.

State Farm Fire & Cas. Co. v. Ham & Rye, LLC, 142 Wash. App. 6, 12-13 (2007) (internal citations omitted). The Court finds that Section II.C. of the Arrowood excess policy is ambiguous in the context presented here and in light of other policy language. Section II.C. could mean, as Arrowood argues, that each excess insurer in an insurance tower can force the insured to prove that every payment made by the underlying insurers fit the definition of "Loss," that no exceptions or limitations on coverage were overlooked, and generally that there had been no overpayments at the lower levels of coverage. On the other hand, the reference to "Loss" could simply mean that the payments the underlying insurers made must be pursuant to the insuring provision of the policy, i.e., for "Loss," and not for some other purpose. The second interpretation is consistent with the weight of authority which holds that an excess insurer is bound by the fact of payment and cannot contest the soundness of the underlying insurer's decision to pay unless there is an indication that the payments were motivated by fraud or bad faith. A reasonable insured reading Section II.C. would not understand that, before it could

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 12

obtain coverage from an excess insurer, it would have to justify the underlying insurer's

payment decisions, especially where Section II.A. says the policy attaches after the full amount

of the underlying limits are paid. Because ambiguities must be construed against the insurer and

in favor of the insured under Washington law (see Holden v. Farmers Ins. Co. of Wash., 169

Wn.2d 750, 756 (2010)), the Court rejects Arrowood's interpretation of Section II.C.

The issue under the consent provision is whether Costco's failure to obtain Arrowood's

consent before incurring post-settlement costs had an identifiable and material detrimental effect

on Arrowood's ability to defend its interests. The Court finds that, by the time Arrowood was

asked to make any payments under its policy, it had had more than a year's notice of the

arbitrations and related expenses, it had an opportunity to take corrective action, and it was free

to pay or not pay invoices submitted to it as it saw fit. Arrowood has not identified any particular

expenditure for which it would have refused its consent, instead opting to pay the invoices as

they were submitted under a reservation of rights. Arrowood has not shown that its ability to

defend its legal interests was prejudiced by the lack of consent.

**B. "Defense Costs"**

Arrowood was contractually obligated to pay "damages (including back pay and front

pay), judgments, settlements, pre- and post-judgment interest and Defense Costs . . ." once the

insured's losses exceeded $35 million. Dkt. # 58-2 at 6. "Defense Costs" are the "reasonable and

necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment,

defense and appeal of a Claim against the Insureds . . . ." Dkt. # 58-2 at 5. Arrowood argues that

the post-settlement arbitration fees and costs were not reasonable or necessary to Costco's

defense of the gender discrimination claims and are therefore not recoverable.

1. Reasonableness

Arrowood has taken an all-or-nothing approach, arguing that it was unreasonable to spend over $15 million to distribute an $8 million settlement fund. While the argument is superficially appealing, it does not withstand closer analysis. Arrowood is not challenging the reasonableness of the underlying settlement, which specified both an $8 million non-reversionary payment and the procedure for distributing the settlement fund. Dkt. # 106 at 5. Rather, Arrowood argues that Costco unreasonably administered the settlement procedures, spending way more money than could be justified by its post-settlement exposure. That may be true: with the exception of the Sasaki litigation, Costco had no money at risk after settlement. But the settlement negotiated between the parties and approved by the district court provided for individual arbitration. Thus, in order to fulfill its settlement obligations, Costco would have to spend some money in preparing for and participating in arbitration. Arrowood does not argue that the settlement or distribution plan were, in theory, unreasonable: its global objection to all post-settlement expenses is therefore rejected.

Arrowood makes no effort to show what part, if any, of the arbitration-related expenses it paid were unreasonable. Arrowood offers the expert report of Robert L. Christie in support of its argument that the arbitrations were overstaffed and overworked. Dkt. # 54-9. Mr. Christie's opinions are contradicted by Costco's expert, however. Dkt. # 86 at ¶¶ 5-6. More importantly, Arrowood does not identify specific costs or expenses billed after it was on the risk that were unreasonable, nor is the record sufficient for the Court to independently determine how many arbitrations were conducted between March and October 2018 (when Arrowood was paying the bills), the amount of attorney's fees incurred (as opposed to expert, consultant, and/or mediator

expenses), and/or the reasonableness of those fees. There is, therefore, an unresolved issue of fact regarding whether the invoices Arrowood paid were unreasonable under Washington law.

To the extent Arrowood is challenging the overall post-settlement expenses of $15 million, it is essentially arguing that the underlying insurers overpaid. That is not a valid defense to Costco's request for payment from Arrowood, however. When the underlying policy limits were exhausted and Costco turned to Arrowood for payment of the remaining invoices, Arrowood may have been within its rights to refuse payment if the invoices were unreasonable. It has not made such a showing, however, and is not entitled to a summary determination that the invoices Costco asked it to pay were unreasonable.

2. Necessity

Arrowood argues that the post-settlement fees and expenses incurred in arbitration were not necessary because they could have been avoided entirely if Costco had simply paid the $8 million to plaintiffs for distribution as they saw fit. The fact that Arrowood does not like the settlement is not enough to obviate its obligation to pay for it. As Costco points out, AIG's policy contained a "Settlement Opportunity" provision that would have allowed the insurers to recommend that Costco accept a particular settlement of the underlying class action. If Costco accepted the "Settlement Opportunity" presented by the insurers, its retained limits would be retroactively reduced by 10%. If Costco refused to consent to the settlement, the insurer's liability under the policy would be capped at the amount for which the insurer could have settled plus 50% of any covered loss in excess of that amount. Dkt. # 58-2 at 12. There is no indication that any of the insurers in the employment practices liability tower made a recommendation under the "Settlement Opportunity" provision.

Further, Arrowood's policy requires it to pay "Loss," which includes not only "Defense Costs" but also "settlements." There is no "reasonable and necessary" modifier to the obligation to pay for settlements. It is undisputed that individual arbitrations were part of the settlement agreement negotiated by the parties and approved by the district court. To the extent the post-settlement fees and expenses are "Defense Costs," they were necessarily incurred as part of the settlement agreement.

### 3. Covered Claim

"Defense Costs" are fees, costs, and expenses "resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds." Dkt. # 58-2 at 5. A "Claim" includes an "arbitration proceeding for monetary or non-monetary relief." Dkt. # 58-2 at 4. Arrowood argues that the only relevant proceeding or "Claim" was the federal class action, which was resolved when the district court approved the settlement and entered judgment in May 2014. The settlement did not resolve the underlying dispute, however, it merely set up a framework for reaching and funding individual resolutions. The settlement expressly comprehended - and the district court ordered - additional proceedings to determine each claimant's right to relief. Those proceedings involved both federal litigation in the Sasaki matter and arbitrations. Because the policy obligated Arrowood to pay fees, costs, and expenses resulting from the defense of arbitration proceedings, it has not shown that it has no duty to reimburse Costco for the costs of defending Sasaki litigation or the arbitrations.

## C. Expenses Associated with Programmatic Relief

"Loss" covered by the policy does not include "any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar

relating to a Claim alleging discrimination or other Employment Practices Violation." Dkt. # 58-2 at 6-7. As part of the settlement, Costco agreed to hire a consultant to conduct job analyses, evaluate promotion processes, and develop selection criteria and assessment tools. Dkt. # 64-1 at 51. Arrowood maintains that any expenses related to the consultant and his development of corporate processes do not fall within the definition of "Loss" under the policy.

Costco points out that AIG and Zurich paid the consultant's invoices and argues that the definition of "Loss" includes settlements. Neither argument is persuasive. While Arrowood may not challenge the payment of the consulting expenses by AIG and Zurich, it is free to make its own coverage decisions now that it is on the risk. Shy, 528 Fed. Appx. at 754. As for the inclusion of "settlement" in the list of covered losses, the definition expressly excludes "any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar." The Court will not ignore a more specific provision in favor of a general provision.

Costco also argues that its consultant's work does not fall within the "shall not include" clause.[7] Costco concedes that it hired a consultant to "conduct[] job analyses of the AGM and

---

[7] Arrowood has the burden of showing that the expenses fall within the exclusion to the definition of "Loss."

> Determining if insurance coverage exists is a two-step process: an insured must show that a loss is within the scope of her coverage; the insurer then bears the burden of showing that an exclusion applies. Exclusions from insurance coverage are contrary to the fundamental protective purpose of insurance and we will not extend them beyond their clear and unequivocal meaning. In the same vein, we construe exclusions against the insurer.

Ham & Rye, 142 Wash. App. at 12–13 (2007) (internal citations omitted). In this case, the policy defines loss by listing certain categories of expenditures that are covered, then excludes certain specific expenditures that would otherwise fall within the scope of coverage. This is not a situation where the grant of coverage has within it a limiting factor, as where a policy covers "accidental loss." If that were

GM positions to identify relevant knowledge, skills, and experience associated with persons who succeed in those positions, evaluat[e] Costco's process for promoting to those positions, and develop[] proposed selection criteria and tools to assess performance for those positions." Dkt. # 65 at 34. It then argues that none of these activities relate to "sensitivity, educational, or related programming." Id. The exclusion, however, applies to "educational, sensitivity or other corporate program, policy or seminar" relating to a claim of gender discrimination. Dkt. # 58-2 at 7. The whole point of the consultation was to evaluate and, if necessary, retool Costco's programs, policies, and processes surrounding promotion decisions in an effort to weed out gender bias. Coverage for such broad-ranging and on-going programmatic changes was clearly and intentionally excluded. Arrowood does not have to pay invoices related to this element of the settlement.

**D. Bad Faith Claims Handling**

Washington law imposes upon an insurer a "broad and all-encompassing" duty to handle claims in good faith. St. Paul Fire and Marine Ins. v. Onvia, Inc., 165 Wn.2d 122, 132 (2008). To establish the tort of bad faith handling of an insurance claim, "an insured is required to show that the breach was unreasonable, frivolous, or unfounded. Ordinarily, whether an insurer acts in

the case, a claim would not fall within the insuring agreement unless the loss were accidental, and the insured would have the burden of showing that coverage attached in the first instance. Here, AIG wrote a multi-part definition of "Loss" including both inclusive and exclusive language: that does not make the entire definition inclusive. "Ultimately, we determine coverage by characterizing the perils contributing to the loss, and determining which perils the policy covers and which it excludes." Truck Ins. Exch. v. BRE Props., Inc., 119 Wn. App. 582, 588 (2003) (footnote and internal quotation marks omitted). Arrowood's policy covers losses, including damages, judgments, settlements, interest, and defense costs associated with a claim of an employment practice violation, and Costco must prove that its claim falls within that grant of coverage. The policy then excludes certain otherwise covered losses: Arrowood has the burden of showing the exclusionary language applies in order to avoid coverage.

bad faith is a question of fact for the jury, unless reasonable minds could reach but one conclusion. Context is critical to determining whether an insurer committed bad faith." <u>Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc.</u>, 132 F. Supp.3d 1275, 1288 (W.D. Wash. 2015) (citations omitted). While the Court has rejected most of Arrowood's arguments, it cannot find that it handled Costco's claim in bad faith as a matter of law. By the time Costco notified Arrowood that the underlying limits were about to be exhausted, the amounts that had already been spent to distribute an $8 million settlement fund certainly looked unreasonable, unnecessary, and designed to enrich the attorneys rather than defend or settle the underlying claims. In addition, some of the claimed expenses - namely the costs associated with the programmatic relief - were clearly not "Loss" under the policy. On the other hand, a jury could find that Arrowood's failure to do any investigation, ask any questions, or make any calculations regarding Costco's potential exposure in 2013 and 2014 and its failure to participate in mediation and timely raise the concerns at issue here were unreasonable, frivolous, and/or unfounded under Washington law.

**E. Consumer Protection Act Violation**

Violations of the regulations governing claims handling practices are per se unfair or deceptive acts or practices for purposes of the Washington's Consumer Protection Act ("CPA"). <u>Truck Ins. Exch. v. Vanport Homes, Inc.</u>, 147 Wn.2d 751, 764 (2002). Costco asserts that Arrowood violated various provisions of Washington Administrative Code ("WAC") Ch. 284-30 by misrepresenting pertinent facts or insurance policy provisions, failing to acknowledge or act upon Costco's communications regarding mediation and settlement, failing to affirm or deny coverage within a reasonable amount of time, failing to adopt and implement reasonable

standards for investigating claims, refusing to pay a claim without conducting a reasonable investigation, and not attempting in good faith to settle the underlying claims.

The factual basis for these alleged violations is sparse and/or conclusory, and Costco does not acknowledge Arrowood's role as a third level excess insurer whose duty to pay under the policy did not attach until April 2018 when evaluating the reasonableness of Arrowood's communications and participation. For example, with regards to the allegation that Arrowood refused to pay claims without conducting an investigation in violation of WAC 284-30-330(4), Costco first states that it tendered the claim in 2003 and that Arrowood did not fully investigate the claim until Costco notified it that the underlying limits would soon be exhausted in or after April 2017. There is no indication that Arrowood refused to cover the claim prior to its investigation. Costco next states that Arrowood "refused to confirm" that it would cover the loss once the Zurich policy limits were reached "even though it had not yet completed its investigation." Dkt. # 65 at 37. Refusing to confirm and refusing to pay are two different things, however, and it is not clear why Arrowood would be required to confirm coverage before finishing its investigation.

Finally, any WAC violation would establish only the first element of a CPA claim. Costco would also have to establish that the particular violative conduct injured its business or property. See Berkshire Hathaway, 132 F. Supp.3d at 1295-96 ("Defendants offer no way for a reasonable fact-finder to trace [the insurer's] non-response in October 2007 and April 2008 through six years of litigation, defense, and mediation and find that non-response to have caused [the insured] to hire personal counsel and agree to a covenant judgment"). On the current record, the Court cannot find as a matter of law that Arrowood violated the CPA.

**F. Insurance Fair Conduct Act Violation**

Costco provides no additional facts or analysis in support of its Insurance Fair Conduct Act ("IFCA") claim. Instead, Costco argues only that a violation of the insurance regulations is a violation of IFCA. As discussed above, however, Costco has not established a regulatory violation on the current record.

**G. Attorney's Fees**

Costco seeks an award of attorney's fees incurred in this coverage litigation, arguing that it was compelled "to assume the burden of legal action[] to obtain the full benefit of [its] insurance contract" under Olympic S.S. Co. v. Centennial Ins. Co., 117 Wn.2d 37, 53 (1991). Whether a party is entitled to an award of fees under Olympic Steamship is a question of law. Colo. Structures, Inc. v. Ins. Co. of the W., 161 Wn.2d 577, 586 (2007). In this litigation, Costco does not assert or offer evidence showing that Arrowood denied coverage or failed to perform under the insuring agreement at the time this lawsuit was filed. Rather, Costco acknowledges that it sued in response to "Arrowood's refusal unequivocally to commit to coverage." Dkt. # 85 at 32.

If Arrowood had denied coverage or if, upon presentation of invoices for payment, it had refused to act and effectively denied coverage, the argument for an award of attorney's fees under Olympic Steamship would be much stronger. As it is, however, Costco sued while Arrowood was still investigating the claim and nine months before the underlying policy limits were exhausted. There may be instances where an insurer effectively refuses to provide the benefits of the insurance contract without expressly denying a claim for coverage, but this is not one of them. Costco sued to obtain a declaration of coverage, but it was not compelled to do so

by Arrowood's conduct. The "thrust" of the Olympic Steamship decision is that "when certain factors combine to frustrate an insured's justifiable expectation of insurance protection" (those factors being (1) the disproportionate bargaining positions of the parties and (2) actions of the insurer that cause the insured to suffer litigation costs in order to obtain the benefits of the bargain), "equity recognizes that an insurance company . . . owes a measure of relief to its insured." McGreevy v. Or. Mut. Ins. Co., 128 Wn.2d 26, 37 (1995). The equitable considerations in this case do not favor an award of fees.[8]

---

[8] The Washington Supreme Court has also indicated that the equities do not favor an award of fees "when an insured has undisputedly failed to comply with express coverage terms, and the noncompliance may extinguish the insurer's liability under the policy. . . Although we have found they are nonetheless entitled to the insurance proceeds because the insurers were not actually prejudiced by their noncompliance, we cannot justify an attorney fees award under these circumstances." Klickitat, 124 Wn.2d at 815. See also Liberty Mut. Ins. Co. v. Tripp, 144 Wn.2d 1, 20 (2001) (reasoning that where the insured failed to comply with the express terms of the insurance contract, it is that failure that triggers a coverage denial and precipitates the coverage litigation, not the insurer's conduct). In Klickitat, the insured had settled the underlying litigation without the consent of its insurers. If Klickitat created a bright line rule foreclosing an award of fees whenever a condition to payment is breached, it would present a second, independent reason to deny Costco's fee request.

While not necessary to the disposition of the claim for fees in this case given the balance of the equities discussed in the text, the Court finds that Klickitat does not create an absolute bar to recovery where a condition has been breached but rather identifies another factor to be weighed by the Court. In T&G Construction, decided fourteen years after Klickitat, the Washington Supreme Court again dealt with an insurance coverage dispute where the insured had not obtained the insurer's consent before settling the underlying litigation. The court cited Klickitat for the proposition that the insurer must show prejudice before a lack of consent would invalidate coverage, but did not mention the case when granting the insured's request for attorney's fees. T&G Constr., 165 Wn.2d at 269 and 273-74. To the extent T&G Construction dealt with the identical issue and directly conflicts with Klickitat, Washington law recognizes that "[a] later holding overrules a prior holding sub silentio when it directly contradicts the earlier rule of law." Lunsford v. Saberhagen Holdings, Inc., 166 Wn.2d 264, 280 (2009). To the extent T&G Construction can be distinguished from Klickitat on the ground that the insurer in T&G Construction had notice of the mediation and settlement but refused to participate (whereas the insured in Klickitat kept the insurers in the dark), the decisions can be harmonized by reading Klickitat not as establishing a bright line rule, but rather as identifying an additional equitable factor to be considered when determining whether an award of fees is appropriate. See Madera W. Condo. Ass'n v. First Specialty Ins. Corp., C12-0857JCC, 2013 WL 5192964, at *5 (W.D. Wash. Oct. 1, 2013) (finding

**H. Motions to Strike**

Unless the issue on which an attorney has provided a declaration relates to claims handling or litigation activities in which the attorney was personally involved, the Court has relied upon the deposition transcripts and exhibits submitted, not on counsel's summary or characterization of the evidence.

Costco's motion to strike expert testimony regarding the reasonableness of Arrowood's claims handling actions is denied without prejudice to a future <u>Daubert</u> motion.

The local rules of this district authorize litigants to file notices of supplemental authority if the Court has not yet ruled on the underlying motion. LCR 7(n). The notice must not contain argument, however. The Court has considered only the exhibits submitted on January 22, 2019.

CONCLUSION

For all of the foregoing reasons, the parties' motions for summary judgment are GRANTED in part and DENIED in part. Arrowood concedes that the settlement amount of $8 million was a covered "Loss" under the policy. It paid the remaining balance when it came due and has shown no basis on which that amount should be reimbursed. The Court finds that the post-settlement arbitration costs paid by Arrowood - including mediator expenses, expert fees, and attorney's fees - are recoverable "Loss" as long as they are reasonable, and the record does not support a finding that any particular invoice or portion of an invoice was unreasonable. Costco is not entitled to recover expenses incurred on programmatic relief, however, or its

---

insured was entitled to fees despite failure to provide a copy of the underlying complaint to the insurer where the failure was the result of the insurer's earlier and unambiguous denial of insured's tender of the claim).

attorney's fees in this coverage litigation. Neither party is entitled to summary judgment on

Costco's tort and statutory claims.


Dated this 25th day of March, 2019.

MR S Lasnik

Robert S. Lasnik
United States District Judge